UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| MICHAEL PETRO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 11-151-GFVT |
| V. | ) | |
| | ) | |
| BENJAMIN JONES, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| Defendants. | ) | **ORDER** |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

After a serious automobile accident involving Benjamin Jones and the Petro family, Jones' insurance company, Kentucky Farm Bureau, agreed to pay the limits of its policy to the Petroes[1]. Jones assumed that by offering the limits, he would be released from the pending litigation. Auto-Owners Insurance Company, the insurer of the automobile operated by the Petroes, disagrees. As a result, Jones' filed the Motion for Order Compelling Full Release and Dismissal with Prejudice of Benjamin Jones. [R. 59.]

In addition, the Petroes, Auto-Owners, Erie Insurance Exchange, and Celina Mutual Insurance Company have all filed Motions for Declaratory Judgment [R. 63, R. 64, R. 65, R. 66] setting forth their respective views on whether Kentucky or Indiana law applies to the interpretation of the insurance policies and the correct priority of coverage provided under their respective policies.

Finally, Auto-Owners finds itself embroiled in a separate controversy with the Petroes. After the family's attempt to collect payments from the Auto-Owners Underinsured Motorist

---

[1] The Petro family includes Michael and Teena Petro, husband and wife, and Brandon and Kimberly Petro, husband and wife, and their three minor children.

(UIM) Policy was unsuccessful, they filed the Motion for Leave to File Amended Complaint. [R. 78.]  They seek permission to raise common law and statutory bad faith claims against Auto-Owners for what they consider are unfair settlement practices.  Because all the pertinent motions require deciding initially whether Indiana or Kentucky law applies, they will be ruled upon jointly in this opinion.

<h1 style="text-align:center">I</h1>

In May 2009, the Petroes were traveling on Kentucky Route 1275 in Wayne County, Kentucky, in a Chevrolet Tahoe, owned by James Neal, who had given them permission to occupy and operate it. [R. 1, at 3.]  Jones, traveling in the opposite direction, crossed over the center line, and collided, head-first, into their vehicle. [*Id.*]

Jones' vehicle was insured by a KFB policy, with liability limits of $25,000.00 per person and $50,000.00 per accident.  The Tahoe and Neal are insured by Auto-Owners, and the policies included UIM coverage limits of $500,000.00.  Additionally, Neal acquired an Auto-Owners' Umbrella Policy with a UIM limit of $1 million.  The Petroes are entitled to coverage under these policies because they were operating the vehicle with Neal's permission at the time of the accident.  Besides being covered by the Auto-Owners' policies, Michael and Teena Petro are also insured by Erie, with UIM limits of $250,000.00 per person and $500,000.00 per accident.  Brandon and Kimberly Petro, along with their three children, are insured by Celina, with UIM limits of $100,000.00 per person and $300,000.00 per accident.

<h1 style="text-align:center">A</h1>

Following the filing of the suit, KFB offered the limits of its policy to resolve the claims against Jones, and the claims of his passenger, Gracie Sumner.  On January 5, 2012, the Petroes' counsel communicated via email and regular mail to the insurance companies that a settlement

had been reached with Jones and KFB. [R. 71-1.]  The letter indicated that KFB "had offered [its] policy limit of $50,000.00", and that "Ms. Sumner will be allocated $5,000.00, and the remainder will be allocated among the Petro family members." [*Id.*]  Counsel also advised that pursuant to Kentucky statutory and case law, this letter constituted notice of settlement, and that the insurance companies involved in the litigation had to advance payment within 30 days. [*Id.*] He explained that if they did not comply, they would waive their rights to subrogation. [*Id.*]

Counsel for Celina responded to the correspondence on January 9 asserting that it was insufficient to constitute notice. [R. 71-2.]  He explained that proper notice under Kentucky law required they "be given an accurate figure for settlement so it can be determined how much [payment] would be substituted." [*Id.*]  Counsel for Celina also noted he would "consider the 30 days substitution period to begin once . . . the breakdown of how the settlement will be applied" is received. [*Id.*]

By the end of that day, the Petroes' counsel replied, and advised that "$45,000.00 [would] be divided equally among the six injured parties (not including Kim[berly] Petro, who is making a loss of consortium claim, only)." [R. 71-3.]  He calculated "that would be an allocation of $7,500 each." [*Id.*]  Auto-Owners tendered payments to the appropriate Petroes' on February 8, 2012, but counsel for Jones objected to the timeliness of the payments.  According to him, the 30-day period to substitute payment began running on January 5, and ended on February 4, 2012. [R. 71-5.]  Auto-Owners contends that January 9 triggered the start of the 30-day period because that is the date on which they received confirmation of the proper allocation of the settlement amount. [*Id.*]  Because of this dispute, Jones has not been dismissed from this litigation.  Hence, he has now filed a Motion for Order Compelling his Full Release and Dismissal with Prejudice. [R. 59.]

**B**

Meanwhile, the Petroes, Auto-Owners, Erie, and Celina have all filed Motions for Declaratory Judgment [R. 63, R. 64, R. 65, R. 66] regarding the extent of coverage under each applicable policy and the priority of those coverages.  The Petroes argue that public policy concerns compel the application of Kentucky law, which entitles them to stack benefits to increase the amount of compensation received for injuries they sustained because of the accident.  The insurance companies take the position that Indiana law applies, precluding the Petroes from combining coverages, while allowing each insurance company to set-off payments against any insurance company that is obligated to pay before them.

Alternatively, the Petroes argue that even if Indiana law applies, they are entitled to stack coverages because anti-stacking provisions in the Erie and Celina policies do not sufficiently preclude them from doing so.  Erie and Celina disagree, and argue that their anti-stacking provisions closely track the language of the Indiana statutory provision approving of such clauses, comporting with Indiana case law.  Moreover, there is disagreement among the insurance companies about whether Auto-Owners Umbrella Policy provides coverage in excess of its UIM policy or in excess of Erie and Celina's UIM policies.

**C**

Finally, the Petroes want to amend their complaint [R. 78] to assert more claims against Auto-Owners pursuant to Kentucky Revised Statute § 304.12-230, which governs unfair claims settlement practices, and KRS § 304.12-235, governing the prompt payment of claims. [R. 78, at 3, 4.]  The Petroes assert that despite Auto-Owners admission that its UIM policy provides primary coverage, it has refused to pay the limits of its policy to help cover their medical bills. [*Id.*]  They also claim that Auto-Owners refuses to acknowledge that Jones is solely responsible

4

for their injuries. [*Id.*]  Moreover, they allege that Auto-Owners has failed to conduct a reasonable investigation of the facts of the accident and failed to respond promptly to communications regarding their claims arising under the UIM Policy. [*Id.*]

Auto-Owners argues that the Petroes' motion should be denied because it would fail to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. [R. 84, at 4.]  It asserts that Indiana's law, not Kentucky's, applies to this issue, and that under Indiana Code § 27-4-14.5, which governs claims settlement practices, there is no private civil cause of action for such violations. [*Id.*, at 6.]

## II

## A

To address the issues raised in the pending motions, the Court must first decide which state law to apply.  Sitting in diversity, district courts are required to apply the choice of law rules of the forum state. *Hammer v. State Farm Mut. Auto. Ins. Co.*, 950 F.Supp. 192, 194 (W.D. Ky. 1996) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)).  Because the accident resulting in this litigation occurred in Kentucky, application of the Commonwealth's law is appropriate. *See Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983).  A choice of law analysis is also necessary because the result is contingent on which states' law is applied.

## 1

Whether Jones is dismissed from this matter depends on the sufficiency of the notice provided to the insurance companies.  Kentucky and Indiana set different requirements triggering the start of the 30-day period of time the insured has to substitute payment to acquire subrogation rights against the tortfeasor.  Kentucky law requires that the notice be delivered by certified or

5

registered mail. KRS 304.39-320(3).  Indiana law does not include a specific requirement about the form of delivery. I. C. § 27-7-5-6.  If the court were to apply Kentucky law, the Petroes' notice would be insufficient because it was submitted to the parties by email and regular mail. Indiana, however, would approve of this form of delivery, and a substantive analysis of whether enough specificity is included in the notice could be undertaken.  Based on this difference in outcomes, Kentucky's choice of law analysis is triggered. *See Asher v. Unarco Material Handling, Inc.*, 737 F.Supp.2d 662, 668 (E.D. Ky. 2010) ("The Court only needs to go through the choice of law analysis when a conflict occurs between two states' laws.")

In Kentucky, "[s]ubrogation claims are considered contract cases for choice-of-law purposes…" and therefore to determine the proper law to apply "Kentucky utilizes a 'most significant relationship' test". *Miller Truck Lines, LLC v. Central Refrigerated Service, Inc.*, 781 F.Supp.2d 488, 491, 493 (W.D. Ky. 2011); *Saleba v. Schrand*, 300 S.W.3d 177, 180-81 (Ky. 2009).  The significant relationship test followed in Kentucky is set forth in the *Restatement of Laws (Second) Conflict of Law* § 188. *Advanced Solutions, Inc. v. Chamberlin*, 2007 WL 4215654, *3 (W.D. Ky. Nov. 29, 2007).  Under this test, the contacts considered are: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Restatement (Second) of Conflict of Laws*, § 188.

In *Lewis v. American Family Ins. Group*, 555 S.W.2d 579 (1977) the Kentucky Supreme Court applied Section 188 to a choice of law issue between Kentucky and Indiana regarding rights under insurance contracts.  The court held:

> Because the insurance contracts in this case were entered into in Indiana between Indiana parties and concerned automobiles which were licensed and garaged in Indiana, we are of the opinion that Indiana law should govern the rights and liabilities of the parties under these contracts.

*Id.* at 582. Here, Auto-Owners' UIM policy was issued in Indiana [R. 59-5], the Petroes and Neal reside in Indiana [R. 1-2], and the Tahoe was principally garaged in Indiana. *Id.* at 582. According to the teachings of *Lewis*, and given the significant relationship Indiana has to the parties and transaction, Indiana law governs this issue.

**2**

The declaratory judgment issue raises state law conflict concerns as well. KRS § 304.39-320(5), provides that nothing "reduces or affects the total amount of [UIM] coverage available to the injured." For the Petroes this means that any policies applicable to them are available in their entirety up to their monetary limits. For example, Auto-Owners would not be able to reduce the amount they are guaranteed to pay based on their per person and per accident limits by taking into consideration the amounts paid by KFB. Nor would they be able to limit stacking of all the coverages provided to the Petroes' under their policy. Erie and Celina would be affected in a similar manner. Indiana law, on the other hand, allows insurance companies to prohibit stacking of their coverages, and to reduce the amount of their liability based on the presence of primary coverage issued by another insurance company. *See* I.C. § 27-8-9-7. Once again, given this conflict, a choice of law analysis is triggered.

The Petroes concede that under traditional choice of law principles Indiana law controls, but argue that if foreign state law doesn't comport with Kentucky public policy concerns, then Kentucky law must be applied. To support their position, they rely on several cases, but they

have failed to proffer one case standing for the proposition that in this specific context public policy concerns require reviewing this matter under Kentucky law.

In *Hodgkiss-Warrick*, No. 2010-CA-000603-MR (April 8, 2011), a case cited by the Petroes, the Kentucky Court of Appeals was deciding whether to enforce a UIM exclusion provision that existed in an insurance policy executed in Pennsylvania.  The plaintiffs argued that the provision was against Kentucky public policy, and should not be enforceable in this state. *Id.* at 6.  The court noted that under "traditional choice of law jurisprudence . . . Pennsylvania law would be controlling" but explained that " 'Kentucky courts have traditionally refused to apply the law of another state if that state's law violates a public policy as declared by the Kentucky legislature or courts.' " *Id.* at 7 (quoting *State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W.3d 33, 35 (Ky. 2004)).  Because the court found the UIM exclusion against public policy, Kentucky's law was applied instead of Pennsylvania's. *Id.* at 7-8.

Although highly informative of what a Kentucky appeals court might do when a policy executed in another state has a provision excluding UIM benefits, this case is not instructive on the issue presented here.  Auto-Owners' provides UIM benefits.  That fact is not at issue.  The issue is whether Kentucky or Indiana will govern the distribution of those benefits.  *Hodgkiss* simply does not address this specific circumstance.

The remaining cases provided by the Petroes are proffered for the proposition that public policy compels the use of Kentucky law. *See Kentucky Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co.*, 326 S.W.3d 803 (Ky. 2010) (wherein Kentucky Supreme Court opined that "the Motor Vehicle Reparation Act is social legislation that must be liberally construed to accomplish [its] objectives."); *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447 (6th Cir. 2009) (wherein the court reviewed previous Kentucky cases that "explained the circumstances in which

8

an insured will be deemed to have purchased multiple units of UIM coverage that may be stacked."); *Allstate Ins. Co. v. Dickie*, 862 S.W.2d 327 (Ky. 1993) (wherein the Kentucky Supreme Court concluded that anti-stacking provisions pertaining to UIM coverage unenforceable and against Kentucky public policy.).

There is no denying that Kentucky has a pension for applying its law when public policy concerns are implicated, but this general principle must be applied in proper context. Notably, none of these cases involved a choice of law analysis. In *Pennington*, "[t]he parties agreed that the insurance contract at issue [was] governed by Kentucky law." 553 F.3d at 450. In *Kentucky Farm Bureau* and *Allstate* there is no mention of or any reference to a choice of law analysis, presumably because the parties engaged in litigation did not contest the application of Kentucky law.

For precisely this reason, these cases are inapposite to the issues presented here. Instead, cases in which a court addresses and resolves choice of law issues arising from the application of insurance policies are more instructive. Fortunately, *Lewis* and *Hammer* provide this teaching. In *Lewis*, the plaintiffs, two brothers, were seriously injured in an automobile accident when their vehicle collided with an uninsured motorist's vehicle. 555 S.W.2d at 581. Plaintiffs attempted to recover under two automobile liability insurance policies, both written and issued by American Family Insurance Group. *Id.* American disputed plaintiffs' right to recover. *Id.* Before the court addressed the issue of whether plaintiffs were entitled to recover under the policies, it had to determine whether Indiana or Kentucky law applied to the insurance policies. *Id.* The plaintiffs were residents of Indiana, the insured vehicle was garaged principally in Indiana, and the policies were sold and delivered in Indiana. *Id.*

In making its determination, the court utilized the most significant relationship test, and found that Indiana law controlled. *Id.* at 582.  The court reasoned that even though the accident that triggered the application of the insurance policies occurred in Kentucky, Indiana law controlled "[b]ecause the insurance contracts in [the] case were entered into in Indiana between Indiana parties and concerned automobiles which were licensed and garaged in Indiana." *Id.*

Although the *Lewis* court did not reach the specific issue of whether anti-stacking provisions have any bearing on the conflicts analysis, it did articulate the standard for deciding the correct law to apply in these situations.  The *Hammer* court relied on that standard and dealt with a similar factual predicate to the one presented here.  There, the plaintiff was seriously injured in an automobile accident with Barbara Simms, who was at fault. *Id.* at 193.  The accident occurred in Kentucky, and the company car driven by the plaintiff was registered in Kentucky, but there were several connections to Indiana. *Id.*  The lawsuit involved the plaintiff's personal insurance policies with State Farm, and whether State Farm's anti-stacking provisions were enforceable and whether it was entitled to set-off against other sources of coverage for the wreck. *Id.* at 193-95.  The court undertook a choice of law analysis and adopted the reasoning of the *Lewis* court. *Id.* at 194.  Given that the plaintiff was a resident of Indiana, that the policies were purchased in Indiana, that the premiums were paid in Indiana, and her insured vehicles were garaged in Indiana, the court concluded that the "Indiana 'contacts' predominate[d]" such that Indiana law should apply. *Id.* at 194.  Based on this finding, the court upheld State Farm's anti-stacking provision, and allowed it to set-off its liability payments reducing them to zero. *Id.* at 196.

Both *Hammer* and *Lewis* clearly stand for the proposition that if the insurer is a resident of another state, entered into an insurance policy in another state, and has the insured vehicles

garaged in another state, then that state's laws should apply.  That is exactly the situation here. The Petroes are residents of Indiana, Neal the named insured of the Auto-Owners' UIM Policy, is a resident of Indiana, and his Tahoe was garaged in Indiana.  Kentucky, as the case law provides, has a preference for applying its law, but based on these facts established precedent instructs that Indiana law controls including that which addresses anti-stacking provisions.

**3**

With regard to their motion to amend, the Petroes seek to assert a bad faith claim in accordance with provisions of KRS §§ 304.12-230 and 304.12-235.  Section 304.12-230 provides that "[i]t is unfair claims settlement practice for any person to commit or perform" acts or omissions that frustrate the settlement process, slow the prompt investigation of claims arising under insurance policies, and unreasonably delay the payment of claims.  KRS § 304.12-230. Section 304.12-235 dictates the timing that "[a]ll claims arising under the terms of any contract of insurance shall be paid to the named insured person or healthcare provider" within 30 days "from the date upon which notice and proof of claim, in the substance and form required by the terms of the policy, are furnished the insurer."  KRS § 304.12-235(1).  That provision also prescribes certain penalties an insurer will incur if it fails to abide by the 30 day requirement. For example, the "insured person or health care provider shall be entitled to be reimbursed for his reasonable attorney's fees incurred" and the "the value of the final settlement shall bear interest at the rate of [12%] per annum from and after the expiration of the [30] day period. KRS § 304.12-235(2), (3).

Indiana has adopted laws governing unfair settlement practices too, but those laws only permit the state insurance commissioner to take action to remedy such conduct.  *See* I.C. §§ 27-4-1-4.5, 27-4-1-18.  There exists no civil right to sue. *See* 27-4-1-18.  Because Indiana and

11

Kentucky treat bad faith claims differently, Kentucky choice of law analysis is once again triggered.

Deciding whether Kentucky or Indiana's law governs depends on whether the bad faith claim rests in tort or contract. Claims arising in tort require utilizing the significant contact test to determine which state's law applies, but if the claim rests in contract theory, then as explained previously, court's utilize the most significant relationship test to determine the proper state law to apply. *Miller Truck Lines,* 781 F.Supp.2d at 491 (citing *Saleba*, 300 S.W.3d at 181 (Ky. 2009)).

The Petroes argue that Kentucky law applies because bad faith claims sound in tort. [R. 88, at 2.] Auto-Owners concedes that "[f]irst-party bad faith claims are torts", but insists they "only arise from the breach of the insurance contract." [R. 84, at 7-8 (citing *Curry v. Fireman's Fund Ins., Co.*, 784 S.W.2d 176, 178 (Ky. 1989); *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 410 (6th Cir. 2005).] By determining that bad faith claims must arise from the breach, Auto-Owners concludes that this is a matter of contract law. [*Id.*]

It does not appear that the Kentucky Supreme Court has issued an opinion that is directly on point with this narrow topic. Both parties proffer cases to support their arguments, but they are limited in their usefulness. Neither of the cases relied on by Auto-Owners supports the proposition that bad faith claims arising out of insurance policies are contract matters for purposes of the choice of law analysis. *See Curry v. Fireman's Fund Ins., Co.*, 784 S.W.2d 176, 178 (Ky. 1989) (where the court established a common law right to recovery in tort when an insurance company acts in bad faith in dealing with its own insured.); *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 410 (6th Cir. 2005) (where the

12

Sixth Circuit addressed whether awarding punitive damages resulting from a bad faith claim in an insurance context was permissible "where a breach of contract is accompanied by tortuous conduct.")).

The Petroes' cases also fail to address the issue. In *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993), and *Wilson v. State Farm Mut. Auto. Ins. Co.*¸ 795 F.Supp.2d 604 (W.D. Ky. 2011), there was no choice of law analysis undertaken. In *Combs v. International*, 163 F.Supp.2d 686 (E.D. Ky. 2001), a choice of law analysis was undertaken, but because "both parties agree[d] that Kentucky law applie[d] . . . the choice of law question [was] removed…" from debate. 163 F.Supp.2d at 691, 696.

Therefore, this court must look to other sources for guidance. "If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The [c]ourt may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." *Miller Truck Lines*, 781 F.Supp.2d at 491 (quoting *Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999)).

Despite the dearth of opinions addressing this issue, there is support to conclude that Kentucky's Supreme Court would apply Indiana law. In *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368 (Ky. 2000), the Kentucky Supreme Court implicitly supported the view that bad faith claims arise out of the insurance policy. While addressing the merits of an argument charging that the Kentucky Unfair Claims Settlement Practices Act (KUCSPA ) was unconstitutional because workers' compensation insurers are subject to different rules than insurers under the KUCSPA, the court concluded that one reason for the difference in treatment

13

is "that a bad faith action is based upon the fiduciary duty owed by an insurance company to its insured based upon the insurance contract." *Id.* at 380.  In *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94 (Ky. 2000), the supreme court again recognized that a bad faith claim "arises out of a breach of contract 'so great that it would constitute tortious conduct on the part of the insurance company." *Id.*, at 100 (quoting *Feathers v. State Farm Fire & Cas. Co.*, 667 S.W.2d 693, 696 (Ky. Ct. App. 1983)).

Moreover, as a public policy matter, Kentucky's bad faith provisions are in place to protect the rights of Kentucky residents.  According to the Kentucky Supreme Court, "Kentucky has no interest in applying [its] public policy to provide benefits to Indiana residents who would not be entitled to them under Indiana law." *State Farm Mut. Auto. Ins. Co. v. Marley*, 151 S.W.3d 33, 42 (Ky. 2004).  As already explained, Indiana does not permit a statutory cause of action for bad faith in the insurance settlement context.  Thus, allowing Indiana residents insured in Indiana to utilize KRS provisions meant for Kentucky residents seems counter intuitive.

Even, if for arguments sake, this matter was considered a tort issue, there is compelling argument that Indiana's law would still apply.  In tort cases, the relevant question is "whether Kentucky has enough contacts to justify applying Kentucky law" *Adam v. J.B. Hunt Transportation, Inc.*, 130 F.3d 219, 230 (6th Cir. 1997).  *Restatement (Second) of Conflicts*, § 145, defines the general choice of law analysis in tort cases and advises that four factors are to be considered:

> (1) the place where the injury occurred;
> (2) the place where the conduct causing the injury occurred;
> (3) the domicile, residence or place of business of the parties; and
> (4) the place where the relationship, if any, between the parties is centered.

These factors do not favor using Kentucky law.  Based on the record before the Court, it is reasonable to assume that the actual injury and conduct, the denial or delay of paying benefits, for which the Petroes seek to amend their complaint occurred in Indiana, not Kentucky.  The insurance policy from which they seek compensation was executed in Muncie, Indiana; they are from Indiana; Neal, who's name appears on the policy as the named policy holder, resides in Indiana; and the vehicle they were driving that day was principally garaged in Indiana.  Thus, it is this Court's opinion that a Kentucky court presiding over this matter would elect to apply Indiana law given the overwhelming relationship to that state.

**B**

**1**

Now having determined which law to apply, the Court turns to the substantive motions. First, the Court addresses whether an order compelling the dismissal of Jones is appropriate. Under I.C. § 27-7-5-6(a), an insurer, who in accordance with its policy pays a person for damages suffered in an auto accident, has subrogation rights against any person who is legally responsible for the injuries.  The insurer attains subrogation rights "to any cause of action in tort which such person may have against any other person or organization legally responsible for the bodily injury or death, or property damage, because of which such payment is made." *Id.*  The insurer loses those rights if:

> (1) the insurer has been provided with a written notice that:

>> (A) informs the insurer of the existence of a bona fide offer of agreement or settlement between its insured and the underinsured motorist; and

>> (B) includes certification of the liability coverage limits of the underinsured motorist; and

(2) the insurer fails to advance payment to the insured in an amount equal to the amount provided for in the offer of agreement or settlement within 30 days after the insurer receives notice...

I.C. § 27-7-5-6(b).  Auto-Owners argues that the notice provided by the Petroes' counsel was insufficient because it lacked specific details regarding the allocation of payment. [R. 71, at 13.] To support its position, Auto-Owners proffers *Hornberg v. Farm Bureau Ins.*, 868 N.E.2d 1149 (Ind.App.2007), but this case does not address the level of specificity required in the written notice to trigger the commencement of the statute's 30-day window.

In Indiana, if a statute is ambiguous, then construction of the statute is necessary. *See D.O. McComb & Sons, Inc. v. Feller Funeral Home, Inc.*, 720 N.E.2d 454, 456 (In. Ct. App. 1999).  A statute is ambiguous, and open to judicial interpretation, only where it is susceptible to more than one interpretation. *Id.* (citing *Matter of Lehman*, 690 N.E.2d 696, 702 (Ind. 1997). Here, the statute is unclear as to whether notice of a "bona fide offer of agreement or settlement" must include a breakdown of the specific moneys to be paid to each insured.  Therefore, the statute is open to judicial interpretation. *Id.*

Indiana courts have not addressed this issue, so the responsibility of ascertaining "the intent of the legislature and to interpret the statute to effectuate that intent" falls to this Court. *Id.* (citing *Holmes v. ACandS*, 709 N.E.2d 36, 39 (Ind. Ct. App. 1999)).  Section (a) explains that the insurance company only acquires subrogation rights after it advances payment to the insured person. I.C. § 27-7-5-6(a).  Only then, is the insurer entitled "to any cause of action in tort which such person may have against any other person or organization legally responsible for the bodily injury or death, or property damage" *Id.*  Reading this section in conjunction with section (b), it is reasonable to assume that if each person is considered an insured, then a specific breakdown is necessary to comply with the statute's requirement that an insurer "advance payment to the

16

insured in an amount equal to the amount provided for in the offer". I.C. § 27-7-5-6(b)(2). Without knowing the amount to be allocated to each insured, the insurer is not in a position to advance payment.  Because the January 5, 2012, letter did not include the amount to be given to each insured, it was insufficient to trigger the start of the 30-day period.

The email communication on January 9, 2012, included that information: "45,000 will be divided equally among the six injured parties (not including Kim[berly] Petro, who is making a loss of consortium claim, only).  By my math, that would be an allocation of $7,500 each." [R. 71-3.]  Consequently, the 30-day period commenced on January 9 because that information allowed Auto-Owners to advance payment to the appropriate persons, and in the appropriate amount.  As a result of Auto-Owners tendering payment within the allotted time, it retains subrogation rights against Jones, and he must continue as a party to this litigation.

### 2

Next, the Court turns to a discussion of the motions for declaratory judgment.  Despite conceding Indiana law prohibits stacking and permits insurance companies to set-off to reduce the amount of their liability, the Petroes' argue that they are still entitled to receive the limits of Erie and Celina's UIM policies.  This position is not supported by the law.

### a

In accordance with the practice in Indiana, an insurance company is permitted to restrict an insured's right to stack insurance policies.  In *Wagner v. Yates*, 912 N.E.2d 805 (Ind. 2009), the Indiana Supreme Court clearly set out the law regarding stacking.  The court explained:

> 'Stacking' of insurance policies occurs when more than one policy is applicable to a loss thus allowing the insured to recover under all policies applicable to the loss (i.e., stack the policies) up to the total damages. *See generally High v. United Farm Bureau Mut. Ins. Co.,* 533 N.E.2d 1275, 1277 (Ind. Ct. App. 1989); *Hammer*, [950 F.Supp. at 194].  Anti-stacking clauses 'limit coverage when coverage under another policy is currently

17

available so as to preclude stacking or double recovery of uninsured motorist coverages.'
*Bullock,* 841 N.E.2d at 240 (quoting *Pafco Gen. Ins. Co. v. Providence Washington Ins. Co.,* 587 N.E.2d 728, 729 n. 2 (Ind.Ct.App.1992)).

*Id.* at 812.  Indiana has codified its anti-stacking policy in section 27–7–5–5 of the Indiana Code,

and it provides:

> The policy or endorsement affording coverage specified in this chapter may provide that the total limit of all insurers' liability arising out of any one (1) accident shall not exceed the highest limits under any one (1) policy applicable to the loss....

I.C. § 27-7-5-5(a).  According to Erie, the UIM portion of its policy tracks the language of this

section.  Erie's "Other Insurance" section of its UIM policy provides:

> Other Insurance
>
> …
>
> For damages to "anyone we protect" while "occupying" a "motor vehicle" "you" do not own, "we" will pay the amount of the loss up to the applicable limit shown in the "Declarations" for one "auto", less the amount that  was paid, or the amount that could have been paid, by other insurance.  Recovery will not exceed the highest limit available under any one policy applicable to the loss.
>
> When the accident involves "underinsured motor vehicles," "we" will not pay until all other forms of insurance under all bodily injury and property damage liability bonds and insurance policies and self-insurance plans applicable at the time of the accident have been exhausted by payment of their limits.

[R. 62-3, at 28.]

Specifically, Michael and Teena Petro argue that Erie's clause "fails to give notice that

anti-stacking occurs when other UIM policies are involved." [R. 62, at 18.]  They rely on the

*Wagner* court's rejection of a purported anti-stacking provision found in American Family

Insurance policy.  There are, however, obvious differences between that provision, and the one

proffered by Erie.

18

In *Wagner*, the court was reviewing a lower court's decision to grant summary judgment for American Family on the issues of whether its insurance policy included set-off and anti-stacking provisions. Brenda Wagner, who was injured in a car accident by Bobbi Yates, was eligible to receive insurance benefits from Allstate, Yates' insurer, State Farm, insurer of the vehicle she was driving, and American Family Insurance, her personal auto insurer. 912 N.E.2d at 807. American Family maintained that its anti-stacking and set-off provisions conditioned the payment of its policy benefits and reduced the amount of its exposure to nothing once Wagner received benefit payments from State Farm and All-State. *Id.* at 808.

The anti-stacking provision, however, lacked any mention of "other insurance." It reads as follows:

> The limits of liability of this coverage as shown in the declarations apply, subject to the following:
>
> (1) The limit of each person is the maximum for all damages sustained by all persons as a result of bodily injury to one person in any one accident.
>
> (2) Subject to the limit for each person, the limit for each accident is the maximum for bodily injury sustained by two or more persons in any one accident.
>
> We will pay no more than these maximums no matter how many vehicles are described in the declarations, insured persons, claims, claimants or policies or vehicles involved in the accident.

*Wagner*, 912 N.E.2d at 812. The court noted that the "purported anti-stacking provision [did] not appear to condition the maximum amount of recovery available to an injured party on an external policy." *Id.* at 813. It was also observed that the provision "ma[de] no reference to other insurance policies or UIM coverage to indicate the insured's maximum recovery will be limited by other policies." *Id.* Thus, the court concluded that "at most the provision is not an anti-

19

stacking provision at all; and at least the provision is ambiguous and therefore unenforceable."

*Id.*

Within the opinion, the court also identified "other insurance" clauses that had been approved of in the past by Indiana courts.  After referencing a few of these provisions, the court explained that:

> "[t]he common thread binding these anti-stacking provisions together is that each clearly refers to insurance other than that provided by the insured's own policy: 'other applicable similar insurance,' or 'any other providing similar insurance,' or 'other uninsured motorist coverage available.'  In this way a policy holder is on notice that anti-stacking will occur when other UIM policies are involved."

*Id.* at 813.  Given this standard, Erie's reference to "other insurance" and "all other forms of insurance" clearly expresses Erie's intentions of preventing stacking with respect to its policy limits.

Based on the teachings of *Wagner*, Erie is also entitled to reduce its liability based on its set-off provision.  I. C. § 27-7-5-5(c) provides that "[t]he maximum amount payable for bodily injury under . . . underinsured motorist coverage" is either the difference between the amount paid by the tortfeasor and the per person limit of their underinsured policy or the difference between "[t]he total amount of damages incurred by the insured" and the amount paid by the tortfeasor. I. C. § 27-7-5-5(c).  The "Limitations of Payment" section of Erie's UIM policy provides in pertinent part:

> "We" will pay no more than the Uninsured/Underinsured Motorists' Coverage limits shown on the "Declarations" for the "auto" involved in the accident regardless of the number of persons "we" protect, "autos we insure," premiums paid, claims made or "autos" involved in the accident.

> If "anyone we protect" insures more than one "auto" and none of the "autos" are involved in the accident, the highest limit of uninsured/underinsured motorists coverage applicable to any one "'auto'" will apply.

20

…

Reductions

The limits of protection available under this Uninsured/Underinsured Motorist Coverage will be reduced by:

…

(3) the amount of any Liability Protection paid or payable to "anyone we protect." This includes all sums payable under the Liability Coverage of this policy.

(4) the amount of any payments to the "insured" and/or injured party made pursuant to any auto medical payments provision in this or any other policy applicable to the loss.

[R. 62-3, at 27-28.]  According to the Petroes' interpretation of this language, Michael and Teena can collect additional amounts above and beyond the limit of liability of the primary Auto-Owners UIM policy from Erie. [R. 63, at 14-16.]  To support this argument, they again rely on *Wagner*.

The American Family policy at issue in *Wagner* also included a set-off provision providing that the limits of its coverage would be reduced by "[a] payment made or amount payable by or on behalf of any person or organization which may be legally liable or under any collectible auto liability insurance for loss caused by an underinsured motor vehicle." 912 N.E.2d at 808.  The court held that language did not allow it to set-off against State Farm for payments it made in accordance with its UIM policy. *Id.* at 810.  Instead, the court focused on two phrases within the provision: "by or on behalf of any person or organization which may be legally liable," and "under any collectible auto liability insurance" to determine whether it was entitled to reduce the amount of its liability by setting-off against the amounts paid by State Farm through its UIM policy. *Id.* at 808-810.  The court concluded that neither phrase captured payments from State Farm's policy.   As to the former, the court held that the phrase referred to

21

"payments by or on behalf of those *directly liable* for causing the injuries." *Id.* at 810 (emphasis added). As to the latter, the court found it too ambiguous to expand its meaning to include payments made from other insurance policies. *Id.* at 810-11.

The Petroes argue that the set-off language present in Erie's policy is identical to American Family's, and therefore, because of its ambiguity, should not be used to allow Erie to set-off payments against KFB, and Auto-Owners. [R. 63, at 15-16.] Notably missing, however, in their analysis is any mention of subsection (4) of the "Reductions" provision. This subsection as explained above reduces the limits of protection available to the Petroes under Erie's UIM policy if they are entitled to "any other policy applicable to the loss." [R. 62-3, at 28.]

Here, there is reference to "other policy applicable to the loss," and pursuant to Indiana case law clauses conditioning payment responsibilities on the existence of other insurance are valid and enforceable. *Hammer*, 950 F.Supp. at 196 (citing *Pafco General Ins. Co. v. Providence Washington Ins. Co.,* 587 N.E.2d 728, 729 n. 2 (Ind.Ct.App.1992) (" 'Other insurance' clauses limit coverage when coverage under another policy is concurrently available so as to preclude stacking or double recovery of uninsured motorists coverages.")). Thus, under the plain reading of the provision, Erie is permitted to reduce the amount of its UIM liability by the amount of any payments made to the Petroes by KFB and Auto-Owners' primary UIM policy.

Celina is entitled to the same treatment as Erie. As was stated before, the *Wagner* court, after reviewing other Indiana cases dealing with the same matter, noted that acceptable anti-stacking provisions all "clearly refer[] to insurance other than that provided by the insured's own policy." *Wagner*, 912 N.E.2d at 813. The list of acceptable phrases included: " 'other applicable similar insurance,' or 'any other policy providing similar insurance,' or 'other uninsured motorist coverage available.' " *Id.* at 813. Juxtaposing these acceptable phrases with American Family's

22

provision the court determined that the "purported [] provision makes no reference to other insurance policies or UIM coverage to indicate that insured's maximum recovery will be limited by other policies." *Id.*

By contrast, Celina's provision references additional insurance policies.  Under the section heading "Other Insurance" it reads:

If there *is other applicable insurance* available under one or more policies or provisions of coverage:

1. Any recovery for damages under all such policies or provisions of coverage may equal but not exceed the highest applicable limit for anyone vehicle under any insurance providing coverage on either a primary or excess basis.

2. Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage on a primary basis.

3. If the coverage under this policy is provided:

a. On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on a primary basis.

b. On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on an excess basis.

[R. 62-4, at 9.]  Although the Petroes assert that the UIM endorsement includes language similar to the language the *Wagner* court held ambiguous, they do not indicate how the two provisions are similar.  The *Wagner* court noted that the American Family language "appear[ed] to refer only to itself."  Here, it is clear that the language chosen by Celina does not refer to itself and comports with the language previously approved by Indiana courts.  By including such language, Celina has effectively prohibited the Petroes from stacking above the policy limits of the Auto-Owners primary UIM policy.

23

**b**

Next, the Court addresses the priority of the UIM coverages and Auto-Owners Umbrella

Policy.  Auto-Owners concedes that because the Petroes were operating Neal's vehicle and had

his permission, its UIM Benefits are primary in this matter.[R. 66-1, at 3.]  Notwithstanding

agreement on this matter, Auto-Owners argues that its Umbrella Policy is excess to the Celina

and Erie policies. [R. 66-1, at 4.]  It asserts that the "Other Insurance" provisions of the Celina

and Erie policies do not apply to its Umbrella Policy.  The Umbrella Policy provides in pertinent

part:

> 3. COVERAGE
>
> UNINSURED MOTORIST
> UNDERINSURED MOTORIST
> UNINSURED MOTORIST PROPERTY DAMAGE
>
> Subject to 5. CONDITIONS below:
> a. (1) we shall pay compensatory damage to an injured person afforded coverage by an
> underlying policy in accordance with the provisions of the automobile insurance shown
> in Schedule A or such policy's replacement. We shall extend such coverage to your
> relative as though such person was covered by the automobile insurance shown in
> Schedule A or such policy's replacement …

[R. 62-2, at 18.]  This provision obligates Auto-Owners to pay for injuries sustained by a

person receiving coverage through an underlying policy.  An "underlying policy" as defined in

the "DEFINITIONS" section of the Umbrella Policy "shall mean the coverage provided by

Uninsured Motorist, Underinsured Motorist or Uninsured Motorist Property Damage provisions

found: (a) in the automobile insurance shown in Schedule A or such policy's replacement; or (b)

through any other automobile insurance coverage available to you or a relative." [R. 62-2, at 17.]

The policy defines "you" or "your" as "the person named in the declarations and his spouse or

her spouse if living in the same household," while "relative" includes "(a) [y]our relative who

resides in your household; and (b) [a]nyone else, under the age of 21, in your care, who resides in your household." [*Id.*. at 6.]  "Insured (s)" is defined as:

> (b) Any person using an automobile or watercraft you own, hire or borrow and any person or firm liable for the use of such vehicle or craft. Any person using an aircraft you own. Actual use must be with the reasonable belief that such use is with, and within the scope of, your permission.

[R. 62-2, at 6.]

Additionally, Auto-Owners' policy provides that "the insurance afforded by [its Umbrella Policy] shall apply as excess insurance over all other collectible underlying policy(ies)," and that the insurance provided by the Umbrella Policy "shall apply as excess insurance over all other collectible insurance specifically written as excess of an underlying policy.  This provision shall not apply to any insurance specifically written as excess of the insurance afforded by this endorsement." [R. 62-2, at 20.]

Based on these provisions[2], Auto Owners contends that its Umbrella Policy "is a true excess insurance policy under Indiana law," and "clearly and unambiguously provides that it is excess over all other policies." [R. 66-1, at 9.]  Not surprisingly, Erie and Celina take a different view of the Umbrella Policy provisions.  They argue that based on the definitions of "insured(s)," "you," "your," and your "relative," the Umbrella Policy only covers in excess of their policies when the named insureds of the policy, Neal or his spouse, or a defined relative are involved. [R. 72, at 4; R. 76, at 2.]  According to Erie, these terms clearly establish two separate

---

[2]Auto-Owners proffers another provision found under what it considers "general Policy Conditions," arguing that it provides that the Umbrella Policy is excess to all other insurance. [R. 66-1, at 8.]  The provision explains that "[i]f other insurance covering a loss also covered by this policy is available to the insured, the insurance afforded by this policy shall be excess of such other insurance. This does not apply with respect to insurance purchased to apply [sic] excess of this policy." [R. 62-2, at 10.]  However, this provision is inapposite to this analysis, and will not be considered because it is included in the section of the Umbrella Policy specifically providing Umbrella coverage for "Personal Liability." [R. 62-2, at 8.]

categories of insured persons: "you" or a "relative," and "insured(s)" with the Petroes falling into the latter category.  If this interpretation of the terms is accepted, then the Umbrella Policy as an excess policy to the Erie and Celina policies, only extends to the named insureds or a relative.

Under a plain reading of the policy, Erie and Celina appear to be correct.  Auto-Owners' crafted its Umbrella Policy restricting application of the "Other Insurance" provision to only excess coverage of "underlying policies."  Based on the definition included in the UIM portion of the Umbrella Policy,  "underlying policy(ies)" clearly refers to the Auto-Owners' "Comprehensive Personal Liability" and "Automobile Liability" of schedule A, and "any other automobile insurance coverage available to you or a relative." [*Id.* at 17.]  Thus, the only reasonable conclusion to draw given the definitions is that the "Other Insurance" provision is only to apply in excess of other insurance for the Neals, a relative residing in the Neal household, or a person under the age of 21, in Neal's care, who resides in their home.  The Petroes, as far as can be gleaned from the record, do not fit these descriptions.

Auto-Owners also argues that the ruling in *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485 (In. Ct. App. 2004) is instructive here.  They claim it stands for the proposition that a true excess policy can never provide coverage before a primary policy under Indiana law.  There, the issue was whether an umbrella policy explicitly listing an automobile as one it covered, could be considered primary, when another policy had a clause restricting its primary coverage to vehicles owned by its insured. *Id.* at 488, 492.  The court concluded that despite the umbrella policy listing the automobile as an "owned auto," the other insurance company was required to provide primary coverage under its policy. *Id.* at 493.  The court explained that "a true excess insurance policy is secondary in priority to a primary insurance policy, even with respect to an

incident for which the primary policy purports to make itself excess to any other available insurance." *Id.* at 492, 93.

Despite the *Monroe* court's general observations about the relationship between primary and umbrella policies, the issues presented there are dissimilar to those presented here. Here, there is no dispute about which policy is primary. All parties agree that Auto-Owners auto policy is primary. The issue is whether the Umbrella Policy by its terms covers the Petroes in excess of the Auto-Owners UIM auto policy or in excess of Erie and Celina's policies. *Monroe* is not instructive on this point.

Next, Auto-Owners asserts that Indiana law clearly mandates that "a true excess policy is never placed ahead of policies that would provide primary coverage but for the other insurance clauses contained in the policy." [R. 79, at 5.] That is the case under normal circumstances, however, Auto-Owners, by virtue of their own drafting, chose the priority of the coverage provided by their Umbrella Policy. If the Neals, or a relative were standing in the Petroes shoes, then the "Other Insurance" provision would be triggered, and "the insurance afforded by [the Umbrella Policy] [would] apply as excess insurance over all other collectible underlying policy(ies)." [R. 62-2, at 20.] But because the "underlying policy(ies)" definition clearly refers to the Auto-Owners' "Comprehensive Personal Liability" and "Automobile Liability" of schedule A, and "any other automobile insurance coverage available to you or a relative," the "Other Insurance" provision does not apply to the Petroes. [R. 62-2, at 17.]

Lastly, Auto-Owners argues that the language used by Erie and Celina in their policies are "written specifically to be excess to the Auto-Owners [UIM Policy]," but not the Umbrella Policy. [R. 79, 11, 12.] A separate discussion addressing this argument is neither necessary nor relevant. "When interpreting an insurance policy, our goal is to ascertain and enforce the parties'

27

intent as manifested in the insurance contract . . . If the language of the policy is clear and unambiguous, it must be given its plain and ordinary meaning." *Great Lakes Chemical Corp. v. International Surplus Lines Ins. Co.*, 638 N.E.2d 847, 850 (Ind. Ct. App. 1994). There is no ambiguity here, the policy is clear. Auto-Owners made the choice to limit the application of the "Other Insurance" provision to a select group of persons it covers. This decision to place the Umbrella Policy immediately after Auto-Owners UIM policy in the priority line comports with the general aim of providing such coverage. "The whole purpose behind umbrella coverages is to assure that adequate coverage exists, i.e., that umbrella coverage picks up where the underlying policy leaves off…" *United Nat. Ins. Co. v. DePrizio*, 705 N.E.2d 455, 463 (Ind. 1999) (quoting *Bartee v. R.T.C. Transp., Inc.*, 781 P.2d 1084, 1094 (Kan.1989). Thus, Auto-Owners, having made no provision to alter this purpose as it relates to the Petroes, is obligated to pay them in excess of its primary UIM policy and in accordance with the remaining applicable provisions of their Umbrella Policy.

**3**

The last issue to address is whether the Petroes, given the application of Indiana law, can amend their complaint. The answer is yes for some reasons and no for others. If an amendment would be subject to a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, then district courts should not permit the amendment. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000); *Long John Silver's, Inc. v. DIWA III, Inc.*, 650 F.Supp.2d 612, 628 (E.D. Ky. 2009). Here, because Indiana law controls, the Petroes statutory bad faith claims based on Kentucky law will fail. Furthermore, under Indiana law the Petroes have no private cause of action based on the alleged violation of Indiana's unfair claim settlement practices statutes. *See* I.C. §§ 27-4-1-4.5; I.C. 27-4-1-18.

28

Nevertheless, the Petroes are entitled to raise common law bad faith claims in Indiana against Auto-Owners. *See Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518 (Ind. 1993) ("Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured."). For this reason, the Petroes will be allowed to amend their complaint to reflect the addition of common law bad faith claims.

## III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

(1)     Jones' Motion for Order Compelling Full Release and Dismissal with Prejudice [R. 59] is **DENIED**;

(2)     The Petroes' Motion for Declaration of Rights Regarding Underinsured Motorists Insurance Coverages [R. 63] is **DENIED**.

(3)     Erie and Celina's Motions for Declaratory Judgment [R. 64, R. 65] are **GRANTED**;

(4)     Auto-Owners' Motion for Declaratory Summary Judgment on Coverage [R. 66] is **DENIED**; and

(5)     The Petroes' Motion to Amend [R. 78] is **GRANTED in part, and DENIED in part**. The Petroes are permitted to amend their complaint to add claims of common law bad faith, and the Clerk of the Court is DIRECTED to file the amended complaint in accordance with this Memorandum Opinion and Order;

Finally, the **PRIORITY OF COVERAGE** provided under the relevant insurance policies is as follows:

(1)     Auto-Owners' UIM Policy, with a single limit of $500,000.00;

29

(2)     Auto-Owners' Umbrella Policy, with a single limit of $1,000,000.00 for all

Plaintiffs;

(3)     Erie's UIM Policy and Celina's UIM Policy will provide **EXCESS COVERAGE**

to the Petroes.  Erie's UIM Policy, with limits of $250,000.00/$500,000.00, for Michael and

Teena Petro.  Celina's UIM Policy, with limits of $100,000.00/$300,000.00, for Brandon and

Kimberly Petro and their three children.  Erie and Celina shall pay benefits amounts to the

Petroes in accordance with the **SET-OFF** provisions of their polices.

This 27th day of February, 2013.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**